509 So.2d 134 (1987)
Forrest J. LeBLANC
v.
BELT CENTER, INC. and Jack Whiteside.
No. 86 CA 0437.
Court of Appeal of Louisiana, First Circuit.
May 27, 1987.
*135 Van M. Davidson, Lake Charles, for plaintiff-appellant Forrest J. LeBlanc.
Doris G. Rankin, Baton Rouge, for defendant-appellee Jack Whiteside.
Phil Breaux, St. Gabriel, for defendantappellee Belt Center, Inc.
Before SAVOIE, CRAIN and JOHN S. COVINGTON, JJ.
SAVOIE, Judge.
This litigation arises out of a franchise agreement between plaintiff-franchisee, Forrest J. LeBlanc, and defendant-franchisor, Belt Center Inc., and its former president, Jack Whiteside. Plaintiff filed suit against defendants alleging unfair trade practices and breach of contract. Following trial on the merits, the judge found in favor of defendants. Plaintiff now appeals.
On August 15, 1980, Forrest LeBlanc (LeBlanc) and Belt Center, Inc. (Belt Center) entered into a master franchise agreement. Under the terms of the agreement, LeBlanc became the Belt Center's exclusive retail outlet in Calcasieu Parish for the sale of automotive, mechanical, and industrial belts. LeBlanc paid $33,500.00 as a franchise fee. He opened for business on September 1, 1980. LeBlanc quickly became dissatisfied with the performance of his business, and on October 30, 1980, he met with officers of Belt Center to voice his complaints. LeBlanc followed the meeting with a letter to Belt Center in which he suggested that his store be sold, that Belt Center rebate part of his franchise fee, or that as per the franchise agreement, he close his store and that Belt Center repurchase his inventory.
Belt Center declined to rebate any part of the franchise fee. LeBlanc filed suit in April, 1981. He continued to operate his store through the summer of 1984, when the case went to trial.
Plaintiff sought recovery of the franchise fee and damages. He alleged that the master franchise agreement should be annulled because the defendants had failed to comply with the franchising disclosure regulations of the Federal Trade Commission (FTC). Plaintiff also alleged that the Belt Center had breached the master franchise agreement.
Both defendants, Belt Center and Jack Whiteside, filed exceptions of no right of action on the basis that the FTC franchising disclosure regulations did not create a private right of action. Judge Charles William Roberts treated the exception as a no right and a no cause of action; he found that there was no private cause of action based on the FTC disclosure regulations. However, he denied the exception because the other allegations of the petition dealing with defendant's breach of contract did state a cause of action.
Plaintiff subsequently amended his petition to allege that any violation of the FTC *136 disclosure regulations constituted an unfair trade practice under state law or, alternatively, rendered the franchise agreement null under the doctrine of contra bonos mores. Plaintiff filed a motion for summary judgment based on these contentions. Judge Remy Chiasson denied the motion for summary judgment without assigning reasons. Trial on the merits was held before Judge C. Lenton Sartain, on October 24, 1984. Judgment was rendered in favor of defendants on January 15, 1986.
Plaintiff now appeals, urging four assignments of error, as follows: (1) the trial court erred in finding that defendant's failure to comply with the FTC regulations did not constitute an unfair trade practice; (2) the trial court erred in failing to find that defendant's noncompliance with the FTC regulations rendered the master franchise agreement null under LSA-C.C. art. 12; (3) the trial court erred in failing to award plaintiff damages under LSA-R.S. 1405(A); (4) the trial court erred in failing to find that defendant breached its franchise agreement with plaintiff.
These assignments of error present two issues: whether the failure to comply with the FTC franchising disclosure regulations constitutes an unfair trade practice, and whether the defendant breached the franchise agreement with plaintiff.
Both plaintiff and defendants agree that 16 C.F.R. § 436.1 (1978) is applicable to this case, and that defendants did not comply with the disclosure requirements. The FTC regulation reads as follows:
In connection with the advertising, offering, licensing, contracting, sale, or other promotion in or affecting commerce, as `commerce' is defined in the Federal Trade Commission Act, of any franchise, or any relationship which is represented either orally or in writing to be a franchise, it is an unfair or deceptive act or practice within the meaning of section 5 of that Act for any franchisor or franchise broker:
(a) to fail to furnish any prospective franchisee with the following information accurately, clearly, and concisely stated, in a legible, written document at the earlier of the `time for making of disclosures' or the first `personal meeting'....
Basically, what must be disclosed is the following:
1. identifying information as to franchisor
2. business experience of franchisor's executive officers and directors
3. business experience of franchisor
4. litigation history
5. bankruptcy history
6. description of franchisee
7. initial funds required to be paid by franchise
8. recurring funds required to be paid by franchisee
9. affiliated persons franchisee is required or advised to do business with by franchisor
10. obligation to purchase
11. revenues received by franchisor in consideration of purchase by franchisee
12. financing arrangements
13. restriction of sales
14. personal participation required of franchisee in operation of franchise
15. termination, cancellation, renewal of franchise
16. statistical information concerning number of franchises
17. site selection
18. training programs
19. public figure involvement
20. financial information
The only written documents which plaintiff received from defendants were the master franchise agreement and an itemized listing of the properties and services plaintiff would receive once he executed the master franchise agreement. The only information that these documents contained which was required to be disclosed by the FTC regulation concerned the initial funds plaintiff was required to pay, a description of the franchise, the restriction of sales to Calcasieu Parish, termination and renewal provisions, training programs, and site selection.
*137 Plaintiff contends that the failure of defendants to comply with the disclosure regulations constitutes an unfair trade practice simply because defendants did not comply. Plaintiff does not allege or prove that he was prejudiced due to defendants' failure to disclose this information. Plaintiff alleged that defendants misrepresented the price of the belts, plans for a Baton Rouge warehouse, and the profits plaintiff would make. Yet, information about these representations would not have been disclosed under 16 C.F.R. Sec. 436.1 (1978). It should be noted that 16 C.F.R. Sec. 436.1(b) (1978) does require several disclosures whenever any financial projections are made.[1] Yet plaintiff did not raise this as an issue at anytime.
In determining whether an act constitutes an unfair trade practice, our courts have held that:
a practice is unfair when it offends established public policy and when the practice is unethical, oppressive, unscrupulous, or substantially injurious to consumers.... Admittedly, the definition of what may constitute an unfair act or practice is broad and subjective. Thus, it is best that the determination of what may amount to an unfair act or practice remain the province of the courts applied on a case by case basis. Roustabouts, Inc. v. Milton H. Hamer, Jr., et al., 447 So.2d 543 (La.App. 1st Cir.1984) (cites omitted).
Because recovery under the Unfair Trade Practices Act consists of damages, penalties, and attorney's fees, the statute is penal and is subject to a reasonably strict construction. Coffey v. Peoples Mortgage & Loan of Shreveport, Inc., 408 So.2d 1153 (La.App. 2nd Cir.1981).
We agree with the trial court that the failure to comply with the FTC disclosure regulations did not constitute an unfair trade practice. There was no element of fraud, misrepresentation, deception, or unethical conduct in the confection of the franchise agreement. We find that assignments of error nos. 1 and 2 have no merit and our finding pretermits any need for consideration of assignment of error no. 3.
Plaintiff's fourth assignment of error is that the trial court erred in finding that defendant did not breach the contract. Plaintiff alleged that defendant breached the franchise agreement by failing to acquire a Baton Rouge warehouse and by charging him excessive prices on the belts that they sold him with an additional service charge on the sale. Plaintiff also alleged that defendant's former president, Jack Whiteside, exaggerated the estimated profits.
In order to understand plaintiff's allegations, it is necessary to explain defendant's marketing concept. According to the franchise agreement, "Franchisor has created a plan and system for the procurement and marketing of belts of all sizes, kinds and for all purposes, at a price below many competing brands." Belt Center's marketing strategy is to sell belts by width and length instead of by manufacturer's serial number, allowing for the interchange of many belts. Because Belt Center only handles belts it could buy a larger volume of belts and could charge less than a store handling belts along with other merchandise.
LeBlanc testified that during his early meetings with Whiteside, he was told that Belt Center planned to acquire a larger Baton Rouge warehouse. LeBlanc alleged that because Belt Center failed to acquire a *138 new and larger Baton Rouge warehouse, its marketing concept was thwarted. A new warehouse would have enabled Belt Center to maintain a larger inventory, allowing Belt Center to acquire the belts in a larger quantity at a lower cost. Belt Center could then supply LeBlanc with more belts faster and at a lower cost. Prejean, owner of the Lafayette Belt Center, also testified that he was told of plans to build a Baton Rouge warehouse.
Richard Baker, an officer of the Belt Center corporation, testified that there were plans to build a Baton Rouge warehouse. However, these plans were contingent upon the successful operation of additional franchises which would necessitate a large volume of belts. Because the Lafayette store and Lake Charles store were experiencing difficulties and because no new franchises were begun, Belt Center could not get a new warehouse.
Plaintiff did not show that he was damaged by the defendant's failure to acquire a new warehouse. There was no showing that the price or the availability of belts was affected. Furthermore, there were plans to build a new and larger warehouse in the future; plaintiff could not prove that at the time the representation was made, defendant had no intention of fulfilling the plan of acquiring a new warehouse.
Plaintiff's second allegation of breach of contract is that he was charged too much for the belts defendant sold him. The Franchise Agreement further provided in paragraph 3, "The company [franchisor] will, to the best of its ability, arrange to make available the necessary stock of inventory for its Belt Center Service Centers and will make such inventory available to the Dealer [franchisee] at the company's [franchisor's] established dealer price at the time of delivery...." Both plaintiff and Prejean testified that it was their opinion that their prices were higher than their competitors. Yet they could not substantiate their opinions with any factual evidence. On cross examination, LeBlanc testified that he was able to supply a particular brand of belt, which met 75% of his clients' needs at a better price than his competitors.
Plaintiff further argues that by charging the 11% service charge on belts he purchased, the defendant failed to offer him belts at the current dealer price in breach of the franchise agreement. Yet LeBlanc testified that he had agreed to the service charge prior to signing the franchise agreement. The agreement in paragraph 3 states that the belts are to be sold to plaintiff at the current dealer price; the agreement does not state that the belts are to be sold to plaintiff at the same price for which defendant purchases them. As with the other allegations of breach of contract, we agree with the trial court that the plaintiff failed to substantiate his claims.
Plaintiff also makes the allegation that during two meetings prior to the execution of the franchise agreement Whiteside grossly exaggerated sales projections for his store. Plaintiff alleged that Whiteside told him his gross sales for the first five years would be $68,000.00, $125,000.00, $240,000.00, $400,000.00, and $700,000.00, respectively. LeBlanc's gross sales for the first two months of operation were $3,300.00 in September and $2,200.00 in October. Although LeBlanc operated his store from September, 1980, through the summer of 1984, he presented no evidence as to his profits during these three and a half years. Cable Prejean testified that the Lafayette store's gross sales for the first three years of operation were $113,763.00 (1980), $187,200.00 (1981), and $265,374.00 (1982). Whiteside did not testify at trial. His services with Belt Center were terminated in the fall of 1981.
We agree with the trial court's finding as set forth in Judge Sartain's reasons for judgment:
"Based on the evidence presented, we are unable to conclude that the averred sales projections given to Mr. LeBlanc by Mr. Whiteside were baseless or given to fraudulently induce Mr. LeBlanc to acquire the franchise."
Accordingly, we find plaintiff's fourth assignment of error to be without merit. For these reasons, the judgment of the *139 trial court is affirmed. Costs to be assessed against the appellant.
AFFIRMED.
NOTES
[1] The regulation reads as follows:

In connection with the advertising, offering, licensing, contracting, sale, or other promotion in or affecting commerce, as `commerce' is defined in the Federal Trade Commission Act, of any franchise, or any relationship which is represented either orally or in writing to be a franchise, it is an unfair or deceptive act or practice within the meaning of section 5 of that Act for any franchisor or franchise broker:
(b) To make any oral, written, or visual representation to a prospective franchisee which states a specific level of potential sales, income, gross or net profit for that prospective franchisee, or which states other facts which suggest such a specific level, unless....
The regulation goes on to list information which is required to be given in support of the profit representation.